UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WILLIAM ROBERT CARTER, JR.                    CIVIL ACTION

VERSUS                                        NUMBER: 16-11702

NANCY A. BERRYHILL, ACTING                    SECTION: "J"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 15, 16).

William Robert Carter, Jr., Plaintiff herein, filed the subject application for DIB on October 7, 2013, alleging disability as of September 6, 2013. (Tr. pp. 177-179).   In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as severe headaches, nerve pain, and severe depression.  (Tr. pp. 193-199).  Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative-review process on May 13, 2014.  (Tr. pp. 121-124).  Pursuant to Plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on October 17, 2014 at which Plaintiff, who was represented by counsel; Plaintiff's wife; and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 125-126, 38-100).  On January 21, 2015, the ALJ issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 17-37). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's

decision on April 23, 2016, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-7). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

1. The residual functional capacity finding was the product of legal error and was unsupported by substantial evidence.

2. The submission of new and material evidence submitted to and disregarded by the Appeals Council supports remanding this case pursuant to Sentence 4 of 42 U.S.C. §405(g).

(Rec. doc. 15-2, p. 3).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since September 6, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: multilevel cervical spondylosis from levels C2-C3 through the C6-C7 level, minimal right foraminal restriction at C2-C3, mild to moderate bilateral foramina restriction present from C3-C4 through C3-C7, spinal stenosis at C5-C6 and C6-C7, central stenosis at C5-C7, tension headaches, obesity, and atypical depression (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with the additional nonexertional limitations of work limited to simple, routine tasks.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on September 5, 1956 and was 57 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 6, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. pp. 22, 23, 25, 31, 32).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries:   (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a

preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2. An individual who does not have a "severe impairment" will not be found to be disabled;

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4. If an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made; and,

5. If an individual's impairment precludes him form performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical evidence that was generated in proximity to the relevant time period[1/] begins with records from Dr. Jennifer Bertsch who saw Plaintiff on September 4, 2013 for routine follow-up care for headaches. Plaintiff was said to be tolerating his lipid medication well with no systemic symptoms, fatigue, or weight gain. Plaintiff advised the doctor that his headaches were manageable at a level of "6," but that he chronic nature of them was wearing on him. He had no neck symptoms or pain. Medications included Ambien, Astelia, Enalapril, Maleate, Lyrica, Metoprolol Succinate, Nexium, Synthroid, Trileptal, Vicodin ES, and Xanax. Plaintiff was described as being self-reliant in usual daily activities and a physical

---

[1/] Under 20 C.F.R. §404.1512(d), the Commissioner is charged with developing the medical history of a DIB claimant "… for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." (Emphasis added). As Plaintiff filed his application for Social Security benefits on October 7, 2013 and alleged disability as of September 6, 2013, approximately one month earlier, the relevant time period begins with the latter date.

examination produced normal results.  The assessment was essential hypertension, primary hypothyroidism, headache syndrome, tension-type headaches, trigeminal neuralgia, and chronic major depression.  Plaintiff was given refills on his Ambien, Vicodin ES, and Xanax and was to return in four months.  (Tr. pp. 401-403).

Plaintiff returned to Dr. Bertsch on September 18, 2013, reporting that he had recently been "let go" from his job.  Medically, his headaches continued and his depression was described as stable.  No "mini" mental status exam was performed and a physical examination again produced normal results.  Plaintiff's headache pain was rated as "0."  The assessment was headache syndrome.  In the treatment note from this date, Dr. Bertsch remarked that Plaintiff should seek Social Security benefits as the pain medications that he was taking on a regular basis supposedly rendered him unemployable.  Plaintiff was to continue on his medication regimen and was to return for follow-up care on an unidentified date.  (Tr. pp. 398-400).

On September 30, 2013, Dr. Bertsch completed a four-page pre-printed form that had been provided to her by Plaintiff's attorney that was denominated "Medical Opinion Re: Ability To Do Work-Related Activities."  On that form, Dr. Bertsch indicated that Plaintiff had no limitations in the ability to lift/carry, stand/walk, or sit; that he did not have to periodically "alternate" sitting, standing or walking to relieve discomfort but needed the opportunity to "shift" at will from sitting or standing/walking; that he had no need to lie down at unpredictable times during a work shift; that he could never perform postural maneuvers such as twisting, stooping, or crouching; that he had no manipulative limitations; and that he was to avoid all exposure to noise, airborne irritants, and workplace hazards but was to avoid only concentrated exposure to extreme cold, heat, wetness, and humidity.  The

doctor further indicated on the form that Plaintiff was unable to function without narcotic medication, that his diagnoses and related symptoms prevented him from engaging in substantial gainful employment, and that his impairments/treatment would cause him to be absent from work more than three times per month. In answer to the question that asked her to specify the medical findings supporting the limitations that she had identified, Dr. Bertsch simply wrote "see records." The doctor indicated that Plaintiff was unable to work full-time but left unanswered the final question on the form, which asked for an onset date or the date on which Plaintiff became unfit for full-time employment. (Tr. pp. 347-350).

On October 1, 2013, Dr. Bertsch completed two additional pre-printed forms that had been provided to her by Plaintiff's counsel. In the first form, titled "Mental Impairment Questionnaire," the doctor recalled having treated Plaintiff since July 11, 2003 and her diagnoses of chronic headaches, anxiety, chronic pain, and depression. Signs and symptoms were identified as sleep disturbance, personality changes, persistent disturbances of mood or affect, decreased energy, and a markedly restricted repertoire of activities and interests. A question that asked the doctor to identify the "clinical findings" demonstrating the severity of Plaintiff's mental impairments and symptoms was left unanswered. In answer to another question regarding medication side-effects, the doctor indicated that Plaintiff took multiple medications on a daily basis that would preclude him from holding a job that involved the use of machinery. In a question containing multiple sub-parts, the doctor indicated that Plaintiff had moderate limitations in the ability to work in combination with or in proximity to others without being distracted and in the ability to interact appropriately with the general public but that he had no limitations in the nine other domains of functioning. Similar to the form that she had previously completed, Dr. Bertsch reported that Plaintiff was

unable to maintain full-time employment and that he would be absent from work approximately three times per month. (Tr. pp. 351-354).

In the second form that was completed by Dr. Bertsch on October 1, 2013, a "Neurological and Orthopaedic Disorder Residual Functional Capacity Questionnaire," she indicated that Plaintiff suffered from chronic headaches and pinched nerves but left unanswered a question inquiring about the existence of any cervical spine disorders. When asked to identify the clinical findings supporting the listed impairments, the doctor again answered "see records." Symptoms were enumerated as multiple tender points, non-restorative sleep, chronic fatigue, frequent severe headaches, anxiety, panic attacks, and depression, the severity of which were all contributed to by emotional factors. Dr. Bertsch further indicated that Plaintiff's pain was localized to the cervical spine but failed to state whether it was on the right side, the left side, or both, Plaintiff was said to experience daily, severe headaches that were precipitated by stress, fatigue, and movement/overuse. He required no assistive device and needed no unscheduled breaks or to elevate his legs. Questions respecting lifting limitations and various postural maneuvers were answered with "NA" and manipulation-related questions were unanswered. Plaintiff was reported to frequently experience pain or symptoms that would interfere with the attention and concentration needed to perform even simple work tasks and his medications carried the risk of fatigue and decreased reflexes. He had no limitations in sitting, standing, or walking and did not require a job that allowed shifting at will from sitting, standing, or walking. Finally, Dr. Bertsch indicated that Plaintiff could not obtain and maintain full-time employment and she left unanswered a question relative to the frequency of absences from work. (Tr. pp. 355-359).

Plaintiff returned to Dr. Bertsch on October 2, 2013 to have disability forms filled out and to obtain follow-up treatment for depression, expressing feelings of hopelessness after losing his job. The assessment was chronic major depression and Plaintiff was started on Prozac. (Tr. pp. 396-397). On October 24, 2013, Plaintiff was seen by Dr. Michael Hickham of the ENT Specialists of Metairie for sinus problems. Plaintiff was prescribed Celestone and other medications. (Tr. pp. 324-325).

The next medical records were generated on December 26, 2013 when Plaintiff presented to the Ochsner Emergency Department ("ED") with complaints of burning epigastric pain accompanied by cramping, bloody diarrhea, and vomiting, with the pain slowly migrating down to his left lower abdomen and groin. Given low blood-pressure readings upon presentation, Plaintiff was admitted to the hospital for further evaluation and testing including a CT scan of the abdomen/pelvis and a colonoscopy that was aborted due to the presence of extensive colitis. During his hospital stay, Plaintiff was treated with Cipro/Flagyl as well as Protonix. By the time of his discharge on December 28, 2013, Plaintiff's lower GI bleeding had resolved but he still had some intermittent cramping. Plaintiff was to follow up with the GI clinic and was to engage in activity as tolerated. (Tr. pp. 410-415, 428-467, 500-538).

Plaintiff was seen again by Dr. Bertsch on January 6, 2014 for a regularly-scheduled follow-up visit. The symptoms that had precipitated his recent hospital admission had largely resolved and he reported that his headaches were being managed with one Vicodin and two Xanax per day, although they had been worse during his acute illness. Plaintiff's memory was unimpaired and he had an adequate fund of knowledge. A physical examination was normal and Plaintiff's pain was rated as "0." The assessment was hypertension, colitis,

9

primary hypothyroidism, tension-type headaches, trigeminal neuralgia, and chronic major depression. Plaintiff was to continue on his medication regimen and was to return in four months. (Tr. pp. 471-474). He was followed further at Metairie Gastroenterology on March 17, 2014 for his recent bout of colitis and a repeat colonoscopy was scheduled for April 1, 2014. (Tr. p. 479). That procedure was performed as scheduled which revealed that the area of previous colitis had healed and that there were no other abnormalities. (Tr. pp. 564-566, 615).

On April 21, 2014, Plaintiff underwent a psychological consultative evaluation by Dr. William Fowler. Plaintiff had driven himself to the evaluation accompanied by his wife. Plaintiff related that on June 13, 2003, he awakened with severe headache pain which he had not been able to relieve below a level of "6." He had been on pain medication since that time which made it difficult for him to work and the doctor's treatment note indicates that Plaintiff had not been able to work for 11 years as a result of the pain. Depression and trigeminal neuralgia were noted along with a medical history of colitis and burning mouth syndrome. In terms of his psychiatric health, Plaintiff reported break through bouts of depression approximately three times per week when his headache pain spiked from a "6" to a "10" and made it difficult for him to sleep. Plaintiff indicated that his medical condition caused him to be withdrawn, irritable and easily agitated. He related being involved in two fights at work some years earlier.

On a personal level, Plaintiff was able to bathe, dress, and feed himself and could drive and find his way around. He was also able to cook, manage money, and shop but found it hard to focus when confronted with excessive noise and crowds. Plaintiff typically spent his time inside performing household chores or watching his ill mother. He advised Dr. Fowler

that he had last worked on September 6, 2013 as a construction supervisor, being let go "because they said [he] was too slow." Plaintiff's mood affected him at work by rendering him agitated. At the time of the evaluation, Plaintiff had unpressured thoughts but reported difficulty staying focused. Present suicidal ideations were denied but he had thought about it several times in the past. Obsessions, compulsions, and hallucinations were denied. Despite reporting agitation and depression secondary to pain, Plaintiff was cognitively intact and presented as doing fairly well, was not in overt pain, and was not overly irritable or depressed.

Based on the results of his evaluation, Dr. Fowler assessed Plaintiff as an individual with a history of depression and hypothyroidism who presented as somewhat dysphoric but was not in overt pain or distress and was calm but plaintive. Bouts of depression occurred two to three times per week based on the level of pain Plaintiff was experiencing. Self-care was not significantly impaired but Plaintiff reported some difficulty focusing and some irritability. Plaintiff was able to understand, retain, and carry out simple instructions but his ability to maintain performance may have been affected by the level of his pain, which may vary over time and render him somewhat unreliable. The diagnostic impression was atypical depression, primary hypothyroidism, trigeminal neuralgia, colitis, burning mouth syndrome, and headaches. (Tr. pp. 482-485).

Plaintiff returned to Dr. Bertsch for a check-up on May 12, 2014, reporting that he was doing well on Prozac but experiencing some sexual side effects. His headaches were unchanged from his previous visit and he was said to be self-reliant in usual daily activities. The results of a physical examination were unremarkable and Plaintiff's pain level was "0." The assessment was "normal routine history and physical," hypertension, primary

hypothyroidism, tension-type headaches, trigeminal neuralgia, and chronic major depression. Plaintiff was given refills on his Vicodin, Xanax, and Zolpidem Tartrate as well as prescriptions for Econazole Nitrate and Astelin spray. (Tr. pp. 584-590).

On June 17, 2014, Plaintiff was seen by Dr. Patrick Waring of the Pain Intervention Center with the chief complaint being identified as posterior cervical pain and severe headaches. The doctor recalled last treating Plaintiff on May 14, 2007 when he performed a cervical interlaminar steroid injection. A history of chronic posterior cervical pain was noted which had worsened over the preceding several years. Plaintiff reported cervical pain and headaches that affected his ability to concentrate and focus. The pain was described as throbbing, sharp, nagging, shooting, and torturing; at a level of "9;" and, unrelieved by other treatment modalities. Upon physical examination, there was posterior cervical tenderness over the facet joints bilaterally at the levels of C2-C3 and C3 accompanied by a mild loss of cervical rotation and with pain upon lateral bending and extension. However, there was good motor strength of the upper extremities and reflexes were intact. Dr. Waring recalled the results of an MRI that was performed on October 4, 2005 which revealed facet arthropathy at C4-C5 and C3-C4 with a small posterior disc osteophyte complex which lateralized to the left causing mild narrowing of both neural foramen at C5-C6. There was also a small broad-based posterior disc bulge that contacted the ventral surface of the spinal cord at C6-C7 with a small amount of cerebrospinal fluid at that level and possible mild facet arthropathy and mild narrowing of the right neural foramen. The impression/diagnosis was cervical spondylosis, cervical disc disease, and headaches. Dr. Waring recommended a bilateral medial branch nerve block at C2-C3 and C3 and an updated MRI of the cervical

spine.  Psychological evaluation and treatment for the depression secondary to his chronic pain were also recommended.  (Tr. p. 572).

On the same date as his evaluation of Plaintiff, Dr. Waring completed two pre-printed forms that had been provided to him by Plaintiff's attorney.  In the first form, denominated "Medical Opinion Re: Ability To Do Work-Related Activities," the doctor indicated that Plaintiff suffered from headaches, cervical spondylosis, cervical disc disease, and depression resulting in mental status changes, poor focus, and a limitation on tasks requiring repetitive lifting, reaching, carrying, or looking up or over the shoulder.  Plaintiff's conditions could also limit his tolerance for using a computer or other devices due to postural considerations and poor concentration.  Dr. Waring estimated that Plaintiff would miss more than three days of work per month and that he was, at any rate, unable to work full-time.  (Tr. p. 490).  In the second form, titled "Prescription Side Effects Re: Ability To Do Work-Related Activities," Dr. Waring indicated that Plaintiff's conditions required treatment with antidepressants, opioid medications, and muscle relaxants which caused dizziness, headaches, anxiety, fatigue, muscle aches, sleep disturbance, daytime sleepiness, disorientation, and changes in mood. The doctor further indicated that Plaintiff should not operate machinery while taking opioids and that medication side-effects rendered him unfit for full-time employment since June 17, 2014, the date that the form was completed.  (Tr. p. 491).

On June 19, 2014, Plaintiff underwent fluoroscopic cervical medial branch facet nerve block/steroid injections at the right and left C2-3 and C3-4 levels.  Plaintiff tolerated the procedure well and was discharged in "excellent" condition with full recovery of sensory and motor functions.  (Tr. p. 571).  Plaintiff returned to Dr. Bertsch on June 25, 2014, with complaints of feeling sluggish, fatigued, drained, being out-of-sorts, and experiencing

13

headaches.  Plaintiff reported feeling hopeless and more depressed since being turned down for disability.  He also reported a worsening of his headaches over the previous few weeks as a result of muscle tenderness and pain following his injection by Dr. Waring.  Plaintiff had no suicidal thoughts but he did question the effectiveness of Prozac.  Plaintiff's headache pain level was rated as a "10" but the results of a physical examination were wholly unremarkable. The assessment was hypertension, primary hypothyroidism, tension-type headaches, trigeminal neuralgia, and chronic major depression.  Plaintiff was prescribed Bupropion and Alprazolam.  (Tr. pp. 591-596).

On June 30, 2014, Dr. Bertsch completed a second form denominated "Medical Opinion Re: Ability To Do Work-Related Activities" that had been provided to her by Plaintiff's counsel, this one being one page in length.  There, the doctor identified Plaintiff's disorders as chronic headaches, depression/anxiety, hypertension, and hypothyroidism. The doctor added that Plaintiff's headaches impaired his ability to focus or to do manual labor which led to severe depressive symptoms that were treated daily with narcotics and thus precluded the use of heavy machinery.  The doctor indicated that Plaintiff would be absent from work more than three times per month and that he was unable to maintain full-time employment.  (Tr. p. 492).  A second form regarding medication side-effects was also completed on this date by Dr. Bertsch, who indicated that Vicodin, Xanax, and Lyrica were required to treat Plaintiff's symptoms in the form of headaches, anxiety, fatigue, sleep disturbance, daytime sleepiness, disorientation, and changes in mood.  Other questions on the form were answered to indicate that Plaintiff was not able to operate machinery while on his medications and that he had been unfit for full-time employment since 2005.  (Tr. p. 493).

At a return visit to Dr. Waring on July 10, 2014, it was reported that the injection had provided Plaintiff 60% improvement in pain symptoms and function for two hours but that he was still experiencing cervical pain and headaches. Cervical tenderness, spasm, and painful loss of motion were observed on physical examination. The diagnosis was cervical radiculitis and cervical degenerative disc disease. In light of those findings, Plaintiff was administered a fluoroscopic cervical interlaminar epidural steroid injection ("ESI") at the C7/T1 level which he tolerated well and left him in "excellent" condition. (Tr. pp. 568, 570).

Plaintiff was seen again by Dr. Waring for further evaluation of his upper cervical pain and headaches on August 5, 2014. Plaintiff reported no meaningful improvement following the most recent ESI on July 10, 2014. Upon physical examination, Plaintiff had posterior upper cervical tenderness at C2-C3 but with no atlantoaxial joint tenderness, good cervical rotation, and mild pain with extension. There was also tenderness through the paraspinous muscles of the cervical spine to the trapezius with no severe spasm and a good range of motion of the shoulders. An upper extremity neurological examination was intact. In his treatment note of this date, Dr. Waring referred to the results of an MRI of the cervical spine that had reportedly been performed on July 22, 2014. That study revealed multilevel cervical spondylosis from the C2-C3 through the C6-C7 levels; minimal right foraminal restriction at C2-C3; mild to moderate bilateral foraminal restriction at C3-C4 through C6-C7; spinal stenosis at C5-C6 and C6-C7; and 9 mm. of central stenosis at C5-C6 and 8 mm. at C6-C7. The impression was cervical spondylosis, cervical disc disease, and headaches. Based upon Plaintiff's history, physical findings, and prior response to treatment, Dr. Waring recommended no additional pain injections at the time. Instead, acupuncture was recommended for pain relief. (Tr. p. 567).

On August 20, 2014, Plaintiff returned to Dr. Bertsch for medication monitoring. Plaintiff related that Wellbutrin was helpful and left him less agitated and he requested that he be maintained on the same dose.  His thyroid medication had been adjusted such that his thyroid level was now normal but he complained of sleeping difficulties.  Plaintiff was said to be self-reliant in usual daily activities and he was in no pain at the time.  A physical examination was normal.  The assessment was hypertension, primary hypothyroidism, tension-type headaches, trigeminal neuralgia, and chronic major depression.  Klonopin was substituted for Xanax and Plaintiff was to return in one month.  (Tr. pp. 597-601).  By September 25, 2014, Plaintiff reported that he did not do well on Klonopin and had resumed taking Xanax.  He had not been able to retain a psychiatrist.  Plaintiff was again said to be self-reliant in usual daily activities and on this occasion his headache pain was said to be a "6."  A physical examination again produced normal results.  The assessment was essential hypertension.  (Tr. pp. 602-607).

On October 12, 2014, Dr. Bertsch completed yet another pre-printed form that had been provided to her by Plaintiff's attorney, this one being denominated "Headaches Medical Source Statement."  On that form, the doctor indicated that Plaintiff suffered from severe, undefined two-hour headaches approximately six times per week that were manifested by throbbing pain, impaired sleep, and exhaustion and were worse with activity.  Dr. Bertsch checked off the appropriate boxes on the form to indicate that anxiety/tension, cervical disc disease, a history of head injury, and hypertension could reasonably be expected to explain Plaintiff's headaches.  The headaches were reportedly triggered by physical exertion, occurred at random, were relieved by nothing, and were contributed to by emotional factors. Further blanks on the form were checked off to indicate that any job stress would exacerbate

16

Plaintiff's headaches, that his impairments would be expected to last at least 12 months, and that he would be precluded from performing even basic work activities when he was having a headache. Medication side effects consisted of constipation and depression. Further blanks on the form were checked off by Dr. Bertsch to indicate that Plaintiff's symptoms would cause him to be off task 25% or more of the time, that he experienced "good days" and "bad days," and that he would likely be absent from work more than four days per month. (Tr. pp. 616-619).

As noted earlier, a hearing *de novo* before an ALJ went forward in this matter on October 17, 2014. Following discussions between the ALJ and Plaintiff's counsel about leaving the record open for the submission of additional evidence, the documentary exhibits that were then extant were admitted into evidence. Plaintiff's attorney followed with an opening statement in which he emphasized the longstanding nature of Plaintiff's chronic headaches and cervical disc problems and the anxiety and depression brought on by his inability to work. (Tr. pp. 40-47). Plaintiff then took the stand and was questioned by his attorney. He testified that he had stopped working in September of 2013 after his neck-related pain became intolerable. Despite reportedly receiving "hundreds" of spinal injections over the years, surgery had not been recommended by any of his physicians, only possible radiofrequency ablation which Plaintiff had declined to pursue given the risks involved. Other attempted treatment modalities included three different types of physical therapy. Turning to his employment history, Plaintiff testified to working for Woodland Design for approximately 14 years, starting out as a trim carpenter and then being promoted to superintendent until latter 2005/early 2006 when his cervical pain increased. Subsequent to that he was an assistant to the superintendent, a less strenuous position. After

17

that, he was moved to the service group doing small jobs. Treatment was provided by Dr. Bertsch, Plaintiff's primary care physician, and Dr. Waring. Plaintiff had also recently attempted to renew his treatment relationship with Dr. Shamsnia, a neurologist. After he stepped down from the superintendent position in 2006, Plaintiff testified that he requested to be reassigned as a trim carpenter but was denied that opportunity as he was no longer able to handle the necessary power tools. (Tr. pp. 47-61).

Upon being questioned by the ALJ, Plaintiff testified that the last time that he performed any physically demanding work was when he was a trim carpenter from 1999 to 2001. Prior to Woodland Design, Plaintiff had been employed by another company as a foreman overseeing interim office renovations. (Tr. pp. 61-64). In answer to his attorney's questions, Plaintiff testified that even with medication, his pain level had not dropped below a "7" in 11 years and was typically at a level of "9" or "10." He no longer engaged in physical activities as he once had, giving up bike riding entirely in 2003. On further questioning by the ALJ, Plaintiff testified that he continued to work in spite of his pain because of a strong work ethic. He had even applied for disability benefits in 2005 and after that claim was initially denied and he was "demoted" from the superintendent position, he continued on in less demanding roles that the company allowed. Plaintiff testified at some length as to the unsuccessful efforts of the doctors whom he had seen over the years to properly diagnose and treat his conditions. One clinic had reportedly demanded exorbitant fees up front before treating him and other doctors simply preferred to prescribe opioid pain medication. Plaintiff testified that he was at that time required to see Dr. Bertsch on a monthly basis as the pain medication that she had prescribed had been reclassified as a Schedule 2 drug. (Tr. pp. 61-73).

Continuing, Plaintiff testified that Dr. Bertsch had prescribed an anti-depressant as well as Vicodin for pain relief. He had stopped taking Oxycodone in 2009 as it made him extremely ill but another doctor who had transitioned from psychiatry to "pain medicine" had recently prescribed a quantity of Oxycodone for him again. Other medication side-effects included diminished sexual drive, disorientation, and increased anxiety. Plaintiff expressed feelings of hopelessness as a result of being out of work. The two injections that he had recently received from Dr. Waring provided little relief and Plaintiff characterized such failed treatment attempts as "... a nail in the coffin." One of Plaintiff's doctors had supposedly recommended some type of experimental surgery that carried various risks but Plaintiff could not provide the ALJ with a meaningful explanation of what that procedure was. Other modalities that had been tried by Plaintiff included acupuncture, acupressure, holistic drugs, various types of massage and physical therapies, hypnosis, biofeedback, and anti-seizure/anti-convulsive/anti-psychotic medications. Of the medications, only Oxycontin as prescribed by Dr. Shamsnia years earlier had provided Plaintiff relief although it made him very sick and volatile. Different types of opioids were being tried as a last resort. Plaintiff admitted to suicidal thoughts that he had not acted upon. The totality of his household's income came from his wife. Plaintiff had completed 10 years of formal education and obtained a GED. (Tr. pp. 73-84). Following Plaintiff's testimony, his attorney gave a closing statement in which he argued that Plaintiff had tried numerous treatment modalities without success, that he was a proud man who worked in pain until he could no longer do so, and that a number of his doctors had opined that he was disabled. (Tr. pp. 84-86).

Plaintiff's wife, Wendy Carter, was the next witness to take the stand. She testified that Plaintiff had spoken of suicide on occasion after his work productivity diminished but

had not acted on any of those intentions.  Plaintiff did assist with household chores while she was at work but was increasingly agitated and unfocused on the task at hand.  Activities like bicycling, boating, and traveling were things of the past and Plaintiff's inability to work left him depressed.  (Tr. pp. 86-91).

Patricia Knight, a VE, was the third and final witness to take the stand.  She began by classifying Plaintiff's past work as a finish/trim carpenter as involving medium, skilled work and that as a carpenter laborer supervisor as involving light, skilled work.  The ALJ then posed a hypothetical question to the VE which assumed an individual of Plaintiff's age and education who was capable of performing medium-level work of a simple, routine nature. Presented with that hypothetical question, the VE testified that the described individual would be unable to perform Plaintiff's past work.  However, the individual could still function as a janitor, hand packager, or dining room attendant, with significant numbers of such jobs existing in the local and national economies.  (Tr. pp. 91-95).  Upon being tendered to Plaintiff's counsel for further questioning, the VE testified that workplace absences on an average of one per month were customarily allowed but that if the individual were "off task" 25% or more of the time he would be unable to maintain employment.  In answer to another query, the VE testified that an individual who would not be able to operate moving machinery because he was taking pain medication would not be able to function as a carpenter but would not necessarily be precluded from working as a laborer supervisor depending on his proximity to the moving machinery or power equipment.  (Tr. pp. 95-98).

After being tendered back to the ALJ for additional questioning, the VE testified that an individual who was capable of only light-level work involving simple, routine tasks would not be able to perform Plaintiff's past work and would have no transferable skills.  The ALJ

then agreed to keep the record open for 15 days for the submission of additional medical records and the hearing was adjourned.  (Tr. pp. 95-99).

Following the administrative hearing, on October 22, 2014, Dr. Joseph Turnipseed, one of Plaintiff's physicians from earlier years, completed a one-page "Work Question Addendum" form that had been provided to him by Plaintiff's counsel.  On that form, the doctor recalled having treated Plaintiff from October of 2005 to March of 2006.  The second question on that form asked, "[i]f disabled, from what date would you consider the individual disabled?"  In answer to that question, Dr. Turnipseed wrote "[p]artial [d]isability-should tolerate sedentary position (light duty)."  Neck pain and headaches were identified as the bases for the doctor's opinion.  In response to another question that asked whether Plaintiff "... had disabling conditions prior to his termination from employment [in September of 2013]," Dr. Turnipseed circled the provided answer "[y]es, he was 'working in pain.'"  The doctor answered affirmatively to the final question which asked, "[d]oes the fact that in 2005, [Plaintiff] was demoted, left his job, and applied for Social Security Disability reinforce the above opinions?"  Below that answer, Dr. Turnipseed added "[a]s noted above, patient's condition should allow sedentary/light duty position[s]."  (Tr. p. 762).

Finally, the administrative record below contains a pre-printed form that was apparently provided to two of Plaintiff's previous employers and was completed by the project manager and superintendent of those two entities on October 30, 2014.  In the first of those forms, the particular company's project manager answered the appropriate questions to indicate that during Plaintiff's nine years of employment there, he required no additional breaks as a result of his physical impairments, did not perform work slower than other employees, was not frequently absent from work, and performed his job satisfactorily

despite working in pain.  The project manager further indicated that Plaintiff's employment had ended in June of 2013 due to "[d]own sizing department."  The project manager further wrote that Plaintiff "… worked with pain … [h]e was very conscientious about his responsibility on the job." (Tr. pp. 293-294).  In filling out the same form, the superintendent of the other company recalled working with Plaintiff for 10 to 15 years for which Plaintiff had been granted no special consideration.  Other questions on the form were answered the same as the project manager had done.  In closing, the superintendent remarked that Plaintiff had worked through the pain that he was experiencing and that his co-workers knew of his suffering.  (Tr. pp. 295-296).

As noted above, Plaintiff challenges the Commissioner's decision to deny him DIB on two grounds, the first one being that the ALJ's residual functional capacity ("RFC") assessment was legally flawed and is not supported by substantial evidence.  Before proceeding to the merit *vel non* of that challenge, the Court will recall the applicable legal standards guiding its review.

The law is clear that an ALJ must consider a claimant's subjective complaints of pain and other limitations.  *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981).  However, it is within the ALJ's discretion to determine their debilitating nature.  *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987).  Pain is considered disabling under the Social Security Act only when it is "… constant, unremitting, and wholly unresponsive to therapeutic treatment" and the mere existence of pain or the fact that an individual is unable to work without experiencing some pain or discomfort does not qualify.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).  The burden is on the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of.

*Selders v. Sullivan*, 914 F.2d 614, 618 (5ᵗʰ Cir. 1990); *Harper v. Sullivan*, 887 F.2d 92, 96 (5ᵗʰ

Cir. 1989). The ALJ must then weigh the plaintiff's subjective testimony against the objective

medical evidence that has been produced. *Chaparro*, 815 F.2d at 1010 (citing *Jones*, 702 F.2d

at 621 n. 4). An ALJ may discredit a plaintiff's subjective complaints of pain and other

limitations if he carefully weighs the objective evidence and articulates his reasons for doing

so. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5ᵗʰ Cir. 1989)(citing *Abshire v. Bowen*, 848 F.2d

638, 642 (5ᵗʰ Cir. 1988)). It must be remembered that the evaluation of a plaintiff's

subjective complaints is a task particularly within the province of the ALJ, for it was the ALJ

who had an opportunity to observe the plaintiff, not the reviewing court. *Harrell*, 862 F.2d

at 480. In the final analysis, the responsibility of weighing the evidence and determining the

credibility of witnesses' testimony and doctors' opinions lies with the ALJ. *Carrier v. Sullivan*,

944 F.2d 243, 247 (5ᵗʰ Cir. 1991); *Greigo v. Sullivan*, 940 F.2d, 942, 945 (5ᵗʰ Cir. 1991); *Wren

v. Sullivan*, 925 F.2d 123, 129 (5ᵗʰ Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5ᵗʰ Cir.

1990).

      The law is also clear that the ALJ has the sole responsibility for determining a

claimant's disability status and is free to reject the opinion of <u>any</u> physician when the

evidence supports a contrary conclusion. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)

(quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled in part on other grounds

by Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080 (2000)). A treating physician's opinions are not

conclusive and may be assigned little or no weight when good cause is shown. *Newton*, 209

F.3d at 456 (citing *Brown v. Apfel*, 192 F.3d 492, 500 (5th Cir. 1999) and *Greenspan v. Shalala*,

38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984 (1995)). Good

cause exists when the treating physician's opinions are so brief and conclusory that they lack

persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion. *Newton*, 209 F.3d at 456; *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The Regulations require an ALJ to perform a detailed analysis of a treating specialist's views under the criteria set forth in 20 C.F.R. §404.1527(c)(formerly §404.1527(d)) <u>only</u> in the absence of controverting medical evidence from other treating and/or examining physicians. *Newton*, 209 F.3d at 453.

Warranting special discussion here are the opinions of physicians, typically treating physicians, that are captured on "To Whom It May Concern" letters or similar checklist-type forms. Such forms, particularly when unaccompanied by any contemporaneously-recorded, medically acceptable findings, are entitled to little weight on that basis alone. *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980). The use of these checklist forms is generally viewed with disfavor when the forms are not adequately supported by any narrative citations to clinical findings. *Rodrigue v. Colvin*, No. 13-CV-1814, 2014 WL 2993423 at *15 (E.D. La. July 2, 2014)(Berrigan, J.); *Brown v. Astrue*, No. 11-CV-2919, 2013 WL 620269 at *6 (E.D. La. Jan. 18, 2013), *adopted*, 2013 WL 619177 (E.D. La. Feb. 19, 2013)(Lemmon, J.); *Haynes v. Astrue*, No. 11-CV-2289, 2012 WL 3860467 at *15-16 (E.D. La. July 23, 2012); *adopted*, 2012 WL 3863171 (E.D. La. Sept. 5, 2012)(Feldman, J.), *aff'd*, 519 Fed.Appx. 258 (5th Cir. 2013)(and cases cited therein); *Morris v. Astrue*, No. 08-CV-4105, 2010 WL 497748 at *10 (E.D. La. Feb. 1, 2010)(Lemmon, J.). Detracting further from the evidentiary value of the opinions set forth in such checklist forms are those that are generated, not in the ordinary course of business, but in anticipation of and more proximate in time to Social Security administrative proceedings. *Haynes*, 2012 WL 3860467 at *15-16. *See also Harrell*, 862 F.2d at 482 ("pain

diary" which began shortly after application was filed and ended just before ALJ hearing entitled to diminished weight).

At step three of the five-step §404.1520 analysis in this case, the ALJ found that Plaintiff's conditions did not satisfy the criteria of any of those set forth in the Listing of Impairments. (Tr. pp. 23-24). Plaintiff does not challenge that finding here. Having so found, the Regulations required that the ALJ make an assessment of Plaintiff's RFC, a term of art that embraces a claimant's ability to work despite his physical and/or mental limitations. 20 C.F.R. §§404.1520(e), 404.1545; *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988). Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining a claimant's RFC is reserved to the Commissioner and at the hearing level that assessment is entrusted to the ALJ. 20 C.F.R. §§404.1527(e)(2), 404.1546(c).

In the present case, the ALJ assessed Plaintiff as retaining the RFC to perform medium-level work with the additional non-exertional limitation that the work involve simple, routine tasks. In making that assessment, the ALJ methodically discussed the wealth of evidence before him including the testimony that was adduced at the administrative hearing and medical records going back as early as June of 2003, even though Plaintiff was admittedly able to work up until September 6, 2013 in spite of his various impairments. *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(citing *Fraga*, 810 F.2d at 1305 n. 11)(ability to work despite pre-existing condition supports ALJ's finding of no disability)).

Among the numerous medical records that were before him were the contemporaneous treatment notes of Dr. Bertsch, Plaintiff's primary-care physician, going back to April of 2012, prior to the date that Plaintiff asserted that he became unable to work. The ALJ noted that a physical examination that was conducted by Dr. Bertsch at that time

was within normal limits and that in October of 2012, Plaintiff reported that his headaches were adequately managed with Vicodin and Xanax. As was discussed earlier, when Plaintiff was seen again by Dr. Bertsch on September 4, 2013, just a mere two days before the alleged disability onset date, he reported that his headache pain, at a level of "6," was "manageable" although it was beginning to wear on him. In that regard, a condition that can reasonably be remedied or controlled by medication is not disabling. *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). On this visit as well as the seven other occasions that Plaintiff was seen by Dr. Bertsch during the relevant time period, the doctor recorded wholly unremarkable physical-examination findings and repeatedly declared that Plaintiff was self-reliant in the activities of daily living. At no time in any of her contemporaneous treatment notes did Dr. Bertsch impose any limitations on Plaintiff's activities, a proper consideration in a Social Security proceeding. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan*, 58 F.3d at 131. In finding that Plaintiff's subjective complaints were not credible to the extent alleged, the ALJ also noted that Plaintiff had no problem with self-care and that he was able to cook, shop, drive, and find his way around with limiting factors being large crowds and loud noise. Plaintiff advised Dr. Fowler that he was capable of managing funds and he typically spent the day doing household chores or tending to his ill mother. Plaintiff's ability to engage in such activities is not indicative of someone who is able to perform no work activities whatsoever. *Fraga*, 810 F.2d at 1302 (ability to walk one-half block, to attend church, and to drive 20 to 30 miles per week supported finding of "not disabled").

At his second visit with Dr. Bertsch on September 18, 2013, Plaintiff related that he had recently been "let go" from his job. A project manager from that company would later report that Plaintiff's job was eliminated due to downsizing of the department in which he

worked, a reason unrelated to his actual ability to perform job-related functions. *See* 20 C.F.R. §404.1566(c). Once again, the results of a physical examination were normal and Plaintiff's pain level on this occasion was said to be "0." (Tr. p. 399). Despite these findings and the fact that Plaintiff had been able to work until just days earlier when his pain was at a manageable level, the doctor advised Plaintiff to apply for Social Security benefits as his pain medication supposedly rendered him unemployable. Further contrasted with the benign findings that Dr. Bertsch had documented in her contemporaneous treatment notes were the three attorney-furnished forms that she completed on September 30 and October 1, 2013, which were inconsistent in terms of Plaintiff's ability to perform postural maneuvers and the need to shift to different positions. And contrary to what was later reported by his former supervisor that Plaintiff needed no special workplace accommodations and was not frequently absent from work, Dr. Bertsch estimated that Plaintiff was unemployable and would be absent from work more than three times per month. When asked to identify the clinical findings supporting the extensive limitations set forth in these first three checklist forms, the doctor simply referred the reader to her contemporaneous treatment records. Those records, however, provide little support for the extensive limitations recorded by Dr. Bertsch on the forms.

By the time of his next visit to Dr. Bertsch on October 2, 2013, Plaintiff's pain level had returned to a "6" but a physical examination again produced normal results. The diagnosis included only chronic major depression and Prozac was prescribed. Several months later, Plaintiff admittedly suffered a bout of colitis that was short-lived and is not alleged to be a disabling condition. At a subsequent follow-up visit to Dr. Bertsch on January 6, 2014, Plaintiff reported that his symptoms were adequately managed with one Vicodin and two

Xanax per day, his pain level was recorded as "0," and physical examination findings were again normal. He was simply continued on his medications and was to return for further follow-up in four months.

On April 21, 2014, Plaintiff was consultatively evaluated by Dr. Fowler who noted that he was able to perform various activities of daily living, was cognitively intact, and was described as "doing fairly well." At his next check-up with Dr. Bertsch on May 12, 2014, Plaintiff was said to be doing well on Prozac except for some sexual side-effects, was self-reliant in usual daily activities, and a physical examination again produced normal results. On this date, Plaintiff's pain level was again noted to be "0." The primary diagnosis in the doctor's assessment was a "[n]ormal routine history and physical" and Plaintiff was simply continued on his medications.

On June 17, 2014, Plaintiff returned to Dr. Waring for the first time in seven years with the chief complaints being posterior cervical pain and severe headaches. Upon physical examination, Plaintiff reportedly demonstrated posterior cervical tenderness over the facet joints bilaterally at C2-3 and C3 with a mild loss of cervical rotation and some pain with lateral bending and extension but he had good motor strength and reflexes were intact. The diagnosis was cervical spondylosis, cervical disc disease, and headaches and a nerve block and updated MRI were recommended. On this date, Dr. Waring completed two one-page forms that had been provided to him by Plaintiff's attorney, the first one being titled "Medical Opinion Re: Ability to Do Work-Related Activities" that was quite different from the same-captioned form that had been completed by Dr. Bertsch on September 30, 2013. Despite not having seen Plaintiff for seven years, Dr. Waring reported on the form that Plaintiff experienced various symptoms that would result in mental status changes, poor focus, and

a limitation on tasks requiring repetitive lifting, reaching, carrying, and looking up or over his shoulders along with decreased tolerance for using computers and similar devices secondary to posture and poor concentration. The Court recalls that when Dr. Bertsch previously completed an identically denominated form she indicated that Plaintiff had no limitations whatsoever in lifting/carrying or reaching (including overhead). In the second form completed by Dr. Waring on June 17, 2014, he indicated that Plaintiff experienced various "side effects/work impairments" as a result of his disorders, none of which had been recorded by Dr. Bertsch, the physician who had prescribed the medications and had followed Plaintiff on a more frequent basis during the relevant time period. It was on that basis that the ALJ understandably accorded little weight to Dr. Waring's abnormal clinical findings and the information he provided in the two attorney-furnished forms. (Tr. pp. 28, 30).

Plaintiff received a nerve block/steroid injection from Dr. Waring on June 19, 2014. He was seen again by Dr. Bertsch on June 25, 2014, reporting feeling fatigued and headache pain at the level of "10." Once again, a physical examination was normal and Plaintiff was prescribed Bupropion and Alprazolam. Five days later, Dr. Bertsch completed two additional forms that had been provided to him by Plaintiff's attorney, a one-page "Medical Opinion Re: Ability to Do Work Related Activities" form and a second one regarding supposed medication side-effects of which none had been previously documented in the doctor's contemporaneous treatment notes. Most notably, Dr. Bertsch indicated in the latter form that Plaintiff had been unfit for full-time employment since 2005, notwithstanding the fact that Plaintiff had admittedly worked up until September 6, 2013. Such glaringly inaccurate information renders the other opinions set forth on the form quite suspect.

On July 10, 2014, Plaintiff advised Dr. Waring that he had obtained 60% relief for two hours following his recent injection and cervical tenderness, spasm, and painful loss of motion were noted on physical examination. He was thus administered an ESI at C7/T1 and was diagnosed with cervical radiculitis and cervical degenerative disc disease. Plaintiff would subsequently report on August 5, 2014 that the aforementioned ESI was ineffective and he exhibited upper cervical tenderness at C2-3 with good cervical rotation and mild pain with extension as well as tenderness to the paraspinous muscles but no severe spasm and a good range of motion to the shoulders. Neurological and physical examinations of the upper extremities revealed them to be intact. The results of a recent MRI were recited by Dr. Waring but the test results themselves are not contained in the administrative record below. The diagnosis was cervical spondylosis, cervical disc disease, and headaches. Only acupuncture was recommended for pain relief. Just over two weeks later, Plaintiff returned to Dr. Bertsch for medication monitoring and reported that Wellbutrin was helpful in controlling his depression. On this occasion, a physical examination was again normal, Plaintiff continued to be self-reliant in the activities of daily living, and his pain level was recorded as "0." Klonopin was substituted for Xanax.

By September 25, 2014, Plaintiff had resumed taking Xanax as Klonopin was ineffective. On this date, Plaintiff's headache pain was recorded as "6," a level he had earlier characterized as manageable while he was still working. Once again, a physical examination was normal and Plaintiff continued to exhibit self-reliance in usual daily activities. The assessment was only essential hypertension. Despite the consistently unremarkable findings in her contemporaneous treatment records, on October 12, 2014, Dr. Bertsch completed her sixth attorney-furnished form titled "Headaches Medical Source Statement."

There, the doctor indicated that Plaintiff suffered severe two-hour headaches six times per week which had numerous causes and resulted in various symptoms. For the first time, constipation was identified as a medication side-effect. Dr. Bertsch further indicated that Plaintiff would be "off task" 25% or more of the time and would be absent from work at least four times per month.

Perhaps the most questionable of the attorney-supplied forms that were presented to the ALJ is the "Work Question Addendum" that was completed by Dr. Turnipseed on October 22, 2014 despite him not having treated Plaintiff since March of 2006, over eight and one-half years earlier. Given the vintage of that treatment history, the form could not and did not contain any clinical findings that were related to the relevant time period. In addition, notwithstanding the phraseology of the questions on the form which were slanted in favor of a finding of disability, Dr. Turnipseed indicated that Plaintiff was capable of "sedentary/light duty" work, contrary to the much more recent findings of Doctors Bertsch and Waring. The e-mail transmissions accompanying the form also lead to the inescapable conclusion that it was created solely in anticipation of litigation. *Haynes*, 2012 WL 3860467 AT *15-16. Management personnel from two of Plaintiff's previous employers would subsequently report that he worked satisfactorily without accommodations or excessive absences despite his pain.

Unlike the situation presented in *Newton*, this is not a case where the ALJ rejected the opinions of a claimant's treating specialist based solely on the testimony of a non-specialty medical expert who had not even examined the claimant. *Newton*, 209 F.3d at 458. As was noted by the ALJ in his written decision, "[t]he claimant's physical examinations have generally been completely within normal limits with limited exception[s]," those being the

abnormal clinical findings recorded by Dr. Waring which were at odds with those documented by Dr. Bertsch before, during, and after the seven-week period in which Plaintiff was under Dr. Waring's care. (Tr. p. 28). The absence of any more significant findings by Dr. Bertsch may properly be considered by an ALJ in adjudicating a claimant's disability status. *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987). As further noted by the ALJ, some five months after Plaintiff was last seen by Dr. Waring he reported to Dr. Bertsch that his pain, then rated "0," was managed with one Vicodin and two Xanax per day. As for the opinions expressed in the forms that were furnished by Plaintiff's attorney, the ALJ understandably accorded little weight to those that did not conform to the treating physicians' clinical notes or were otherwise unsupported by the record. (Tr. pp. 29-30). Such was within the ALJ's province. *Qualls v. Astrue*, 339 Fed.Appx. 461, 466-67 (5th Cir. 2009). The opinions of Dr. Bertsch and Dr. Waring that Plaintiff was unable to work and thus entitled to Social Security benefits are entitled to little significance as that is the ultimate issue reserved to the Commission. 20 C.F.R. §§404.1527(d)(1). Faced with much of the same documentary evidence as was considered by the ALJ, the state-agency medical consultants – highly qualified physicians with expertise in Social Security disability whose opinions must be duly considered by the ALJ – concluded that Plaintiff retained the RFC to perform medium-level work. (Tr. pp. 103-117). 20 C.F.R. §404.1527(e)(2)(i). Owing to the medical evidence of record, the ALJ further limited that range of work to that of a simple, routine nature. As the law requires, the <u>objective</u> evidence supports the ALJ's RFC assessment. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994);

*Augustine v. Barnhart*, No. 01-CV-2685, 2002 WL 927797 at *4 (E.D. La. May 7, 2002); *Collins*

*v. Callahan*, No. 96-CV-3546, 1998 WL 118082 at *3-4 (E.D. La. Mar. 17, 1998).[2/]

Plaintiff's second challenge to the Commissioner's decision is that new and material

evidence was submitted to and "disregarded" by the AC, thus warranting a remand of his

case pursuant to sentence four of 42 U.S.C. §405(g).

As noted earlier, the ALJ issued his written decision in this matter on January 21, 2015

and Plaintiff timely sought review of that decision by the AC on February 6, 2015. While that

request for review was pending, by letter dated September 14, 2015, Plaintiff's counsel

corresponded with the AC and provided supplemental argument for the request, referencing

in support thereof "... eleven (11) Residual Functioning Capacity evaluations prepared by

five different doctors: Bertsch, Warring, Turnipseed, Kohlmaier, and now Reddy, all of which

cite a host of disabling impairments. Exs. 2F; 14F; 15F; 23F; 28F; 29F; 30F." (Tr. pp. 311-

312).[3/] On April 23, 2016, the AC issued notice denying Plaintiff's request for review of the

ALJ's decision. In discussing the evidence that it had considered in reaching that decision,

the AC stated, in pertinent part, as follows:

> We also looked at evidence from Joy R. Kohlmyer, Ph.D (4 pages) September
> 4, 2015 and Ravindra Reddy, M.D. (4 pages) September 11, 2015. The
> Administrative Law Judge decided your case through January 21, 2015. This
> new information is about a later time. Therefore, it does not affect the decision
> about whether you were disabled on or before January 21, 2015.

---

[2/] Despite being duly tendered to Plaintiff's counsel for questioning, no inquiries were made to the VE regarding the ALJ's limitation to work involving only simple, routine tasks. Plaintiff should not now be heard to complain of any deficiency in that regard when it was not deemed to merit adversarial development in the administrative hearing that was held below. *Masterson v. Barnhart*, 309 F.3d 267, 273-74 (5th Cir. 2002); *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

[3/] As the administrative record that was filed in the record of this proceeding contains exhibits numbered only up to 28F, the Court assumes that the exhibits numbered 29F and 30F that were referenced in counsel's missive were the forms that were provided to and completed by Doctors Kohlmaier and Reddy in September 2015 as will be discussed more fully *infra*. Counsel has conveniently attached those forms to his cross-motion for summary judgment as "Exhibit A." (Rec. doc. 15-5, pp. 2-5 and 6-9).

(Tr. p. 2).

The evidence referred to in the notice of the AC consists of two copies of a form, titled "Mental Impairment Questionnaire," that had been provided to those practitioners by Plaintiff's attorney and were respectively completed by Doctors Kohlmaier and Reddy on September 4 and 11, 2015.  (Rec. doc. 15-5, pp. 6-9 and 2-5).  In the form that she completed, Dr. Kohlmaier recalled having treated Plaintiff for the first time on July 24, 2015 and diagnosing him as suffering from major depression disorder (moderate to severe), generalized anxiety disorder, panic disorder, and trauma-related disorders.  Various blanks were checked-off on the form to indicate that Plaintiff suffered from a host of symptoms and the doctor noted a 12-year history of persistent headaches that were unresponsive to treatment and reportedly resulted in an inability to work/function.  A question inquiring about medication side-effects was answered to indicate that Plaintiff had been very lethargic and drowsy from pain medications in the past and that there was a possibility that he would have to go on them again if his pain could not be controlled.  In answer to another question regarding functional limitations, the doctor checked off the appropriate boxes on the form to indicate that Plaintiff suffered from marked limitations in five of the 11 enumerated domains; moderate limitations in four others; a slight limitation in the ability to understand, remember, and carry out simple instructions; and no limitations in the final domain.  In answer to the last three questions, Dr. Kohlmaier indicated that Plaintiff would be absent from work more than three times per month and that he was unable to work full-time from the date that she first began treating him and for the 12 previous years based on the history Plaintiff had provided.  (Rec. doc. 15-5, pp. 6-9).

34

In the identical form that she completed on September 11, 2015, Dr. Reddy stated that Plaintiff had been a patient of his since February 20, 2015 and that he suffered from major depressive and panic disorders. Dr. Reddy went on to identify 15 resulting symptoms, four more than Dr. Kohlmaier had, and marked limitations in seven of the identified domains of functioning and moderate limitations in the other four. Another question asked for the doctor to describe <u>clinical findings</u>, including the results of mental status examinations, which demonstrated the severity of Plaintiff's mental impairment and symptoms. In answer to that question, Dr. Reddy wrote "trouble w/depression/anxiety ongoing." Like Dr. Kohlmaier, Dr. Reddy indicated that Plaintiff would be absent from work more than three times per month and that he was unable to work full-time. Unlike Dr. Kohlmaier, Dr. Reddy stated that Plaintiff had been unfit for full-time employment since approximately September 6, 2012. (Rec. doc. 15-5, pp. 2-5).

As recently observed by the Fifth Circuit,'"[w]hen confronted with new and material evidence, the Appeals Council 'shall evaluate the entire record including the new and material evidence … It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.' 20 C.F.R. §404.970(b)." *Whitehead v. Colvin*, 820 F.3d 776, 780 (5th Cir. 2016). "However, the regulations do not require the Appeals Council to discuss the newly submitted evidence, nor is the Appeals Council required to give reasons for denying review." *Id.* (citing *Sun v. Colvin*, 793 F.3d 502, 511 (5th Cir. 2015)). In this case, the AC clearly stated that it had "looked at" the "Mental Impairment Questionnaire" forms from Doctors Kohlmaier and Reddy. That satisfies its obligation under *Whitehead* and the Regulations.

Evidence that is submitted for the first time to the AC is considered part of the record upon which the Commissioner's final decision is based.  *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).  "If additional evidence is presented while the case is pending review by the Appeals Council, courts [] customarily review the record as a whole, including the new evidence, in order to determine whether the Commissioner's findings are still supported by substantial evidence."  *Higginbotham v. Barnhart*, 163 Fed.Appx. 279, 281 (5th Cir. 2006).  The standards governing the consideration of additional evidence by the AC and a district court are similar in that they both require that the evidence be new as well as material.  *Thomas v. Colvin*, 587 Fed.Appx. 162, 165 (5th Cir. 2014)(citing 20 C.F.R. §404.976(b)(1) and *Bradley v. Bowen*, 809 F.2d 1054, 1058 (5th Cir. 1987)).  Material evidence is that which creates "… a reasonable possibility that it would have changed the outcome of the [Commissioner's] decision."  *Bradley v. Bowen*, 809 F.2d 1054, 1058 (5th Cir. 1987)).  Implicit within the materiality requirement is a temporal element that the evidence "… relate to the time period for which benefits were denied, and that it not concern evidence of a later-required disability or of the subsequent deterioration of the previously non-disabling condition."  *Id.*  The new evidence must thus relate to the time period on or before the date of the ALJ's hearing decision.  *Martinez v. Astrue*, 252 Fed.Appx. 585, 587 (5th Cir. 2007)(citing 20 C.F.R. §§404.970(b), 404.976(b)).

Measured against the foregoing standards, the evidence relied upon by Plaintiff does not warrant a remand for several reasons.  First, the evidence was technically not "new" *vis-à-vis* the AC because it was actually reviewed by that tribunal.  Second, the attorney-crafted forms that were completed by Doctors Kohlmaier and Reddy were unaccompanied by contemporaneously-recorded, medically acceptable findings and are thus entitled to little

weight on that basis alone. *Warncke*, 619 F.2d at 417. Third, as Plaintiff did not go under the care of those doctors until six months and one month, respectively, after the ALJ's decision, they could not and did not provide any findings observed or taken during the relevant time period. *Martinez*, 252 Fed.Appx. at 587 (physicians' fill-in-the-blank forms that post-date the ALJ's decision are not relevant). Finally, the opinions set forth on the forms respecting the date that Plaintiff reportedly became unable to work embrace the ultimate issue reserved to the Commissioner, §404.1527(d)(1), and are refuted by the record itself. Contrary to what Plaintiff argues, the final question on the form asked not when Plaintiff's limitations began but the date on which he became unfit for full-time employment. (Rec. doc. 15-5, pp. 5, 9). Relying on Plaintiff's self-report, Dr. Kohlmaier indicated that Plaintiff had become unable to work 12 years earlier. For his part, Dr. Reddy opined that Plaintiff became unfit for full-time employment since approximately September 6, 2012. Both of those representations are incorrect as Plaintiff was able to and did, in fact, work until September 6, 2013. *Vaughan*, 58 F.3d at 131. At best, the two forms concern subsequently-acquired conditions or the deterioration of conditions that were previously and properly found to be non-disabling. *Leggett*, 67 F.3d at 567. In light of the highly-deferential standard of review applicable to Social Security proceedings, *Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980), it will be recommended that Plaintiff's suit be dismissed.

## **RECOMMENDATION**

For the foregoing reason, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[4]

New Orleans, Louisiana, this __26th__ day of _____July_____, 2017.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[4] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.